Nos. 2--06--0250 & 2--06--0258 cons.      Filed:  3-27-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re OBJECTIONS TO TAX LEVIES OF FREEPORT SCHOOL DISTRICT No. 145, FREEPORT PARK DISTRICT, PEARL CITY SCHOOL DISTRICT No. 200, and HIGHLAND COMMUNITY COLLEGE DISTRICT No. 519, For the Year 2000 | ) ) ) ) ) ) | Appeal from the Circuit Court of Stephenson County. No. 01--TX--29 |
| (Tax Objectors, Plaintiffs-Appellants, v. Pearl City School District No. 200 and Highland Community College District No. 519, Intervenors-Appellees (Freeport School District No. 145 and Freeport Park District, Intervenors)). | ) ) ) ) ) ) ) ) | Honorable Val Gunnarsson, Judge, Presiding. |

| | | |
|---|---|---|
| In re OBJECTIONS TO TAX LEVIES OF FREEPORT SCHOOL DISTRICT No. 145, FREEPORT PARK DISTRICT, PEARL CITY SCHOOL DISTRICT No. 200, and HIGHLAND COMMUNITY COLLEGE DISTRICT No. 519, For the Year 2000 | ) ) ) ) ) ) | Appeal from the Circuit Court of Stephenson County. No. 01--TX--29 |
| (Tax Objectors, Plaintiffs-Appellees, v. Freeport School District No. 145 and Freeport Park District, Intervenors-Appellants (Pearl City School District No. 200 and Highland Community College District No. 519, Intervenors)). | ) ) ) ) ) ) ) ) | Honorable Val Gunnarsson, Judge, Presiding. |

JUSTICE CALLUM delivered the opinion of the court:

I.  INTRODUCTION

Nos. 2--06--0250 & 2--06--0258 cons.

The tax objectors, over 2,000 property owners in Stephenson County, filed a tax objection complaint (35 ILCS 200/23--10 (West 2000)) directed against levies under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act or Act) (745 ILCS 10/9--107(b) (West 2000)) for the 2000 tax year by Freeport School District No. 145, Freeport Park District, Pearl City School District No. 200, and Highland Community College District No. 519 (collectively, the taxing districts). The tax objectors paid the challenged taxes and commenced this proceeding in 2001. The taxing districts intervened. 35 ILCS 200/23--15 (West 2000). The general issue before the trial court was whether the taxing districts' expenditures of their tort levies were authorized by the Tort Immunity Act. Following a bench trial in which the issue of liability was bifurcated from the damages issue,[1] the trial court found as to liability: in favor of the tax objectors and against Freeport School District and Freeport Park District; partially in favor of the tax objectors and partially in favor of Highland Community College; and against the tax objectors and in favor of Pearl City School District. The court reserved the damages issue.

On February 21, 2006, the trial court certified the following questions for interlocutory appeal pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308):

(1) Whether the use of the tort immunity levy to partially fund the compensation of taxing bodies' employees is authorized by the Tort Immunity Act;

---

[1] At trial, the parties agreed that the trial court would initially assess only the legal issues presented. If the tax objectors prevailed on any issues, then the court would, in the damages phase, consider the factual issues to determine the refund amounts owed to individual tax objectors.

(2) Whether the use of revenue generated by Highland Community College's tort immunity levy to pay for safety- and security-related expenditures is authorized by the Tort Immunity Act; and

(3) Whether the use of the tort immunity levy by Freeport School District to partially fund its equity program is authorized by the Tort Immunity Act.

The tax objectors, Freeport School District, and Freeport Park District timely filed separate applications for leave to appeal under Rule 308. On May 24, 2006, this court granted the petitions.

## II. BACKGROUND

### A. Tax Objectors' Suit and Trial Court's Order

On October 2, 2001, the tax objectors filed a tax objection complaint against the taxing districts relating to property taxes levied in 2000 in Stephenson County. In count I, which was directed against Freeport School District No. 145, the tax objectors alleged that the district's year 2000 tort fund levy (for the 2001-02 fiscal year), which equaled $1,299,990.52, was illegal to the extent that it was used for purposes other than procuring liability insurance, unemployment insurance, payment of claims for compensatory damages, payment for legal expenses incurred in connection with claims for compensatory damages, and payment for necessary risk management. They further alleged that the levy was illegal to the extent that it funded an equity program with funds used, in part, for operating expenses for the district and not for compensatory damages or risk management payments. The objectors also alleged that the levy was illegal to the extent it was used to pay for risk management services that were actually services provided by employees as part of their normal duties.

In count II, directed against Freeport Park District, the tax objectors alleged that over $100,000 of the district's $329,198.75 year 2000 tort fund levy was illegal in that it was used for improper purposes. In count III, the tax objectors alleged that Pearl City School District No. 200 improperly used $187,000 of its $218,139.47 tort fund levy in that it paid for claimed risk management services that were not actually related to risk management and that it paid for risk management services that were actually services provided by employees as part of their normal duties. In count IV, the objectors alleged that Highland Community College District No. 519 illegally used $550,000 of its $655,008 year 2000 tort fund levy.

At the bench trial on May 2, 2005, the parties jointly filed 719 "stipulations" and 21 exhibits.[2] They also stipulated to the issues presented. On August 15, 2005, the trial court issued a 42-page memorandum opinion. The court found that the use of tort fund levies by Freeport School District, Freeport Park District, and Highland Community College District to partially pay salaries was not authorized by the Tort Immunity Act. It further found that Pearl City School District's practices were authorized by the Act. The court found that Highland Community College District's use of tort monies to pay for certain safety-related expenses was permissible and that Freeport School District's use of tort monies to pay for its equity program was not authorized by the Act. On October 25, 2005, the court issued an order consistent with its memorandum opinion.

In appeal No. 2--06--0250, the tax objectors appeal the trial court's findings that Pearl City School District was authorized to use tort funds to pay salaries pursuant to its risk management plan (first certified question) and that Highland Community College District's use of tort fund monies to

---

[2] The parties agreed that the stipulations would not be taken as proven, but only that competent testimony could be presented as to them, including authentication of the exhibits.

pay for certain safety services was authorized under the Act (second certified question). In appeal No. 2--06--0258, Freeport School District and Freeport Park District appeal the court's findings that it was improper for those districts to pay certain salaries with tort funds (first certified question), and Freeport School District additionally appeals the court's finding that it illegally used tort funds to pay for its equity program (third certified question).

B. Pearl City School District's Tort Fund Levy

In response to a series of budget deficits, Pearl City School District adopted a risk management plan (Plan) in 1997. Its goal was to reduce and prevent the district's tort liability exposure. Beginning in 1997 and in each subsequent year, the district levied an amount in its tort immunity fund to cover expenditures consistent with its Plan. The district's year 2000 tort fund levy equaled $218,139.47, or about 3.7% of its total expenditures for the 2001-02 fiscal year, which is consistent with Illinois school district practices. The fund is made up of the following subfunds: education, operations and maintenance, and transportation. During the 2001-02 school year, the district spent $196,937 from the tort immunity fund to pay a portion of the compensation to its employees for the risk management duties they performed. It is common practice for a school district to allocate a single expenditure, such as a salary, from multiple funds.

In developing the Plan, the district's superintendent analyzed which employee positions were best suited to prevent exposure to tort liability. The district identified specific liability-prevention responsibilities in the job descriptions of certain personnel. The superintendent reviewed employee job descriptions, observed employees in their jobs, and discussed with employees their responsibilities. The superintendent then recommended to the school board percentages of certain positions that were attributable to risk management functions. The percentages ranged from 5% to

45%, and they reflected the part of each employee's compensation that the district funded with the tort levy.

Employees were not required to document the time they spent performing their employment responsibilities. They received training in risk prevention and safety functions and communicated regularly with the building administrators about safety and tort-prevention topics. If an employee did not perform assigned risk management functions, the district would not retain the employee. Not all employees with risk management duties under the Plan had portions of their salaries paid with tort funds during the 2001-02 fiscal year. The district's independent auditors did not report the district's 2000 levy for noncompliance with the Act.

### C. Freeport School District's Levy

Since 1997, Freeport School District has levied an amount in its tort immunity fund to cover expenditures consistent with its risk management plan and goals. The district's 2001-02 tort fund levy represented 3.7% of its total budget of $35 million, which is consistent with Illinois school district practices. The levy funded risk management plans, goals, and objectives. During the 2001-02 school year, the district used the tort fund levy monies to further its risk management plans by paying about: (1) $333,000 to purchase insurance and related legal services; (2) $691,000 to partially fund its equity program; and (3) $130,000 to pay a portion of the salaries of some of its employees. The district's tort immunity fund is made up of subfunds, including the education and the operations and maintenance funds.

The district determined what percentages of various employees' positions were attributable to risk management and then used tort immunity fund revenue to pay that portion of the compensation attributed to risk management. To determine the appropriate percentages, the district

reviewed employee job descriptions, observed employees in their jobs, and talked with employees about their job responsibilities and performance. Employees received training in safety and specific tort-prevention procedures and regularly communicated with building administrators about safety and tort-prevention topics. The use of tort fund monies to partially fund salaries for risk management purposes is consistent with Illinois school district practices. The district's independent auditors did not report the district's 2000 levy for noncompliance with the Act. The levy monies used to pay portions of certain employees' salaries constituted between 7% and 15% of their total salaries.

The district's equity program was designed to close the achievement gap between African-American and Caucasian students within the district. It is available to all students, irrespective of race. The program consists primarily of educational programs and initiatives that assist the district in ensuring attainment of achievement outcomes of African-American students comparable to such outcomes of Caucasian students. The equity program is funded by the tort fund, the general education fund, and federal funds and grants. About 65% ($620,000) of the budget ($950,000) for the equity program for the 2001-02 fiscal year came from the tort levy and constituted 1.8% of the district's budget. The program's primary expenditures are salaries and benefits.

The district instituted the equity program pursuant to a memorandum of understanding (MOU) entered into in 1997 with a group--the Freeport African-American Ministers United for Change (FAAMUC)--that had threatened class action litigation on behalf of minority students. The district investigated the charges and determined that its practices were a substantial cause of conditions that disparately impacted minority students. In exchange for entering into the MOU, the FAAMUC agreed to forgo the threatened litigation; however, it reserved the right to pursue litigation

in the event that it determined the agreed-upon improvements did not cure the civil rights violations. The parties entered into a substantially similar agreement in 2001 that included the same representations by FAAMUC concerning future litigation.

Also at this time, the Office of Civil Rights (OCR) of the United States Department of Education initiated a compliance review of the district that focused on opportunities for minorities in the district. The district subsequently entered into a settlement agreement with the OCR, in which it agreed to provide improved conditions for minority students and in which the OCR agreed to suspend its investigation.

According to the district, it believed that the threatened lawsuit could have resulted in it being liable for compensatory damages, as well as attorney fees. It further believed that the funding of the equity program was permissible under the Act if it constituted a settlement of a tort claim.

D. Freeport Park District's Tort Fund Levy

Since at least the late 1990s, the Freeport Park District has levied an amount in its tort immunity fund to cover expenditures consistent with its risk management plans and goals. The district's 2001-02 tort fund levy, which equaled about $329,000, represented about 12% of its total revenues for that period, which is consistent with the practices of Illinois park and school districts. The district used the revenue to fund its risk management plans, goals, and objectives. Specifically, the district used $188,000 to purchase insurance and related legal services and $140,000 to pay a portion of the salaries of some of its employees.

The tort levy was expended to pay for activities and programs consistent with the district's risk management objectives. As part of its plan to limit exposure to tort liability, the district reviewed the amount of time its employees performed risk management activities and determined

what percentages of the various employee positions involved risk management functions and responsibilities. The levy funded between 11% and 25% of certain employees' total salaries. Employees were not required to document the time they spent on their job responsibilities. They received training and specific instruction in safety and specific tort-prevention procedures. The district's independent auditors did not report the district's 2000 levy for noncompliance with the Act.

In 1998, the district adopted a safety policy manual administered by a safety committee. Its goal is to eliminate, reduce, or control the various hazards and exposures that cause incidents, and it includes policies on training personnel in safety and loss control practices. In 1999, the district adopted a written risk-management policy.

### E. Highland Community College District's Tort Fund Levy

Highland Community College District No. 519 has a risk management program that is designed to "reduce the exposure of liability risk" to the college and to prevent loss, injury, and illness to anyone who may be on the campus or in the college's buildings at any time. In addition to insurance, claims services, and legal services, the program provides monies for a portion of designated employees' salaries and it pays for procurement and maintenance of safety and security items, equipment, and services and for the training of designated employees to handle loss reduction and prevention issues. Its employees received training and specific instruction in health and safety and tort-prevention procedures.

Prior to approval of its 2000 tax levy, the district conducted a time-to-task study to determine whether the portions of certain employees' salaries that were partially paid from its tort fund accurately reflected the time those employees devoted to risk management activities. As part of the

study, the employees kept time records of their work activities. The district determined the amount of its 2000 tax levy based on the results of its study.

The district levies and collects taxes from several counties. Its Stephenson County tort fund levy, which equaled $269,459.74, constituted 11% of its total Stephenson County levy for the 2000 tax year and represented about 1.5% of the district's budget. About $96,000 of the levy was allocated to pay portions of the salaries and benefits of approximately 35 employees. The district allocated approximately $57,000 of the levy to pay for security- and safety-related services, items, and training (including first aid equipment, road salt, emergency radios, and ergonomics training), and it allocated about $67,000 to purchase insurance. The district's independent auditors did not report the district's 2000 levy for noncompliance with the Act.

### F. Expert Testimony

#### 1. Peter Saxton-Williams

Peter Saxton-Williams's deposition and reports were admitted into evidence. Saxton-Williams, a marketing representative for an insurance company, testified that he is a certified insurance counselor and an associate in underwriting. He has worked in the insurance industry for 25 years. He testified on the tax objectors' behalf that risk management is a process that consists of the following steps: (1) identifying and analyzing loss exposures; (2) selecting a technique or combination of techniques to be used to handle each exposure; (3) implementing the chosen technique; and (4) monitoring the decisions made and implementing appropriate changes.

Addressing Pearl City School District's tort expenditures, Saxton-Williams opined that school teachers and various other employees engage in safety practices as part of their normal duties and by using common sense. Based on a review of job descriptions and other documents, he further

opined that he did not have any information that any of the employees did anything extra to avoid loss exposures; that there was no documentation specifying the risk management activities taken by any employees; and that no documentation indicated what procedures were in place to implement any techniques to obtain a reduction in loss exposure. Saxton-Williams noted that the school superintendent's job description did not reflect that he is responsible for analyzing or implementing a risk management plan. Addressing the district's Plan, Saxton-Williams opined that it does not appear to be a risk management plan within the commonly accepted principles of the insurance industry because it does not identify the actual loss exposures, existing losses, or potential losses against which it is attempting to protect, and it does not delineate personnel responsibilities, including when the responsibilities are performed, their frequency, the actual responsibilities to be performed, and who is monitoring performance. Saxton-Williams further opined that the assigned salary percentages appear to be arbitrary and do not appear to have any relation to any real risk management activities undertaken by any employees. In his view, the district does not engage in any claims services and risk management activities that are not provided for by its insurance policies. He noted that the district's only claims services and risk management activity directly attributable to loss prevention and loss reduction was its purchase of property and liability insurance to protect itself against potential losses.

Addressing Freeport Park District's activities, Saxton-Williams opined that the district does not have a risk management plan. He noted that the district has a safety policy manual and that many safety-related activities are typically included in policies that would be enacted to direct employees in the safe methods of performing their normal work duties. He, however, did not review the safety policy. Saxton-Williams also noted that there is no documentation identifying loss exposures,

procedures to reduce such exposures, and activities taken to monitor decisions made to handle loss exposures.

Saxton-Williams also addressed Freeport School District's practices. He opined that the district's equity program should be funded by the general operating fund because the program does not protect the district against liability or loss for a tortious act. He conceded that, if the program's funding were part of a settlement of a tort claim, then it would be an appropriate use of the tort fund levy. Addressing salaries, Saxton-Williams opined that the district does not have a risk management plan, because there is no documentation of such plan. Accordingly, he further opined that the district's salary expenditures are not risk-management-related expenditures. Saxton-Williams noted that employee salaries paid from the tort fund were paid for the time employees spent on their normal safety practices and that the employees did not receive extra money for performing any risk management activities.

Addressing Highland Community College District's expenditures, Saxton-Williams opined that the district did not have a formal risk management plan, as evidenced by the lack of documentation of such. He noted that the employees did not receive extra money for performing any risk management activities and that it is impossible to determine the time that employees spent on such activities. Saxton-Williams opined that the portions of salaries paid to employees from the district's tort fund reflect estimates of the time those employees engage in their normal safety practices.

Saxton-Williams also took issue with the taxing districts' expenditures for legal fees, noting that there was no documentation establishing that the money was spent for legal services directly

attributable to the taxing districts' insurance, self-insurance, or joint self-insurance programs. Accordingly, he opined that the fees were not authorized by the Act.

## 2. Mark J. Browne

Mark J. Browne's deposition and reports were admitted into evidence on the taxing districts' behalf. Browne, a professor of risk management and insurance, opined that risk management includes activities undertaken to reduce both the frequency of loss (loss prevention) and the severity of loss (loss reduction); that the scope of risk management is not limited to simply the development of a risk management program; that the actual implementation of a program on a day-to-day basis also constitutes risk management; and that risk management includes safety activities. Addressing Saxton-Williams's definition, Browne characterized it as a process and opined that any of the four parts of Saxton-Williams's definition constitutes risk management on its own. Browne further opined that school personnel regularly engage in risk management activities and that it is immaterial that employees engage in these activities as part of their normal duties. Time records are not required. Addressing Pearl City School District's Plan, Browne noted that it is beneficial to the district's risk management program and goes beyond the Act's requirements. Addressing Freeport School District, Browne opined that whether or not the district has a written plan, it faces many potential losses on a daily basis and has addressed potential loss situations by assigning employees risk management responsibilities as part of their jobs. Turning to the district's equity program, Browne opined that, because it decreased the likelihood that FAAMUC would pursue class action litigation against the district, the expenses associated with its implementation are risk management expenses.

Addressing Freeport Park District's expenditures, Browne opined that district personnel regularly engage in risk management activities; that the district gave significant consideration to risk management; that employee job descriptions specify the percentages of time that employees should engage in risk management; and that the district has a safety policy manual, a confined-space entry policy, a hazard communication document, and a risk management policy.

Highland Community College District, in Browne's view, has employees who engage regularly in risk management activities. Job descriptions show that certain employees must be actively involved in risk management. He opined, contrary to Saxton-Williams's view, that the district considered the amounts of time employees spent on risk management activities.

### 3. Robert G. Grossi

Robert G. Grossi's deposition and report were admitted into evidence. Grossi is a treasurer for 12 schools, a financial consultant to municipalities, a chief executive officer for a school finance authority, and an adjunct professor. He opined on the taxing districts' behalf that it is common practice for a school district to allocate a single expenditure, such as a salary, to multiple funds and that this is established in state policy. Effective risk management requires implementation of a program on a day-to-day basis, and risk management includes safety activities. Grossi relied on a text that noted that risk management has a broader meaning now than it had 15 years ago and that insurance is not the only way to manage risk; risk can be reduced by, for example, investing in safety and quality control. All of the 17 school districts he currently advises use tort fund monies to pay portions of their employees' salaries.

In carrying out a risk management program, teachers and custodians are the first line of defense in identifying and preventing risk-related situations. Grossi opined with respect to Pearl City

School District's expenditures that it is appropriate to charge a reasonable percentage of an employee's salary to the tort fund when the employee has an objective or duty of risk management or safety.

Addressing Freeport School District's salary expenditures, Grossi reiterated the foregoing opinions. As to the district's equity program, he opined that it resulted from a settlement and, therefore, funding it with the tort levy was appropriate because it protects the district from potential losses. As to Freeport Park District's expenditures, Grossi opined that it is common practice for an employee's salary to be allocated to multiple funds and that the district's actions were proper. The employees have risk management functions as part of their employment duties, and risk management includes safety activities.

Finally, addressing Highland Community College District's expenditures, Grossi opined that the district's employees perform certain duties with the objective of risk management and that fund accounting concepts permit the district to classify and allocate expenditures into various funds, including the tort fund, based on objectives. If the employees' duties encompass multiple objectives, then their salaries can be divided into multiple funds.

### III. STANDARD OF REVIEW

The scope of review of an interlocutory appeal under Rule 308 is ordinarily limited to the questions certified by the trial court, which, because they must be questions of law, are reviewed de novo. Bauer v. Giannis, 359 Ill. App. 3d 897, 902 (2005). This case involves construction of a statute, which is in any case a question of law reviewed de novo. City of Chicago v. Illinois Commerce Comm'n, 286 Ill. App. 3d 557, 559 (1997). Except where interests of judicial economy and equity lie, we must answer the certified questions without ruling on the propriety of any

underlying order.  P.J.'s Concrete Pumping Service, Inc. v. Nextel West Corp., 345 Ill. App. 3d 992, 998-99 (2004).

IV.  ANALYSIS

A.  First Certified Question: Whether Use of the Tort Immunity Levy to Partially Fund Taxing Bodies' Employees' Compensation is Authorized by the Tort Immunity Act

The first certified question addresses whether the use of the tort immunity levy to partially fund certain taxing bodies' employees' compensation is authorized by the Tort Immunity Act.  The tax objectors, in their appeal as to Pearl City School District, answer the question in the negative. Freeport School District and Freeport Park District, in their appeal, argue that the Act authorizes such expenditures.  We begin by reviewing the relevant statutory provisions.

Section 9--103(a) of the Tort Immunity Act, which addresses insurance contracts, states, in relevant part:

"(a) A local public entity may protect itself against any property damages or against any liability or loss which may be imposed upon it or one of its employees for a tortious act under Federal or State common or statutory law, or imposed upon it under the Workers' Compensation Act, the Workers' Occupational Diseases Act, or the Unemployment Insurance Act by means including, but not limited to, insurance, individual or joint self-insurance, including all operating and administrative costs and expenses directly associated therewith, claims services and risk management directly attributable to loss prevention and loss reduction, legal services directly attributable to the insurance, self-insurance, or joint self-insurance program, educational, inspectional, and supervisory services directly relating to

-16-

loss prevention and loss reduction \*\*\*."  (Emphasis added.)  745 ILCS 10/9--103(a) (West 2000).

Section 9--107(a) of the Tort Immunity Act provides:

"(a) The General Assembly finds that the purpose of this Section is to provide an extraordinary tax for funding expenses relating to tort liability, insurance, and risk management programs.  Thus, the tax has been excluded from various limitations otherwise applicable to tax levies.  Notwithstanding the extraordinary nature of the tax authorized by this Section, however, it has become apparent that some units of local government are using the tax revenue to fund expenses more properly paid from general operating funds.  These uses of the revenue are inconsistent with the limited purpose of the tax authorization.

Therefore, the General Assembly declares, as a matter of policy, that (I) the use of the tax revenue authorized by this Section for purposes not expressly authorized under this Act is improper and (ii) the provisions of this Section shall be strictly construed consistent with this declaration and the Act's express purposes."  (Emphasis added.)  745 ILCS 10/9--107(a) (West 2000).

Section 9--107(b) of the Tort Immunity Act provides, in relevant part:

"(b) A local public entity may annually levy or have levied on its behalf taxes upon all taxable property within its territory at a rate that will produce a sum that will be sufficient to: (I) pay the cost of insurance, individual or joint self-insurance (including reserves thereon), including all operating and administrative costs and expenses directly \*\*\* attributable to loss prevention and loss reduction, legal services directly attributable to the insurance, self-insurance, or joint self-insurance program, and educational, inspectional, and

supervisory services directly relating to loss prevention and loss reduction, participation in a reciprocal insurer as provided in Sections 72, 76, and 81 of the Illinois Insurance Code, or participation in a reciprocal insurer, all as provided in settlements or judgments under Section 9--102, including all costs and reserves directly attributable to being a member of an insurance pool, under Section 9--103; (ii) pay the cost of and principal and interest on bonds issued under Section 9--105; (iii) pay judgments and settlements under Section 9--104; and (iv) discharge obligations under Section 34--18.1 of The School Code, as now or hereafter amended, and to pay the cost of risk management programs. ***

Funds raised pursuant to this Section shall only be used for the purposes specified in this Act, including protection against and reduction of any liability or loss described hereinabove and under Federal or State common or statutory law, the Workers' Compensation Act, the Workers' Occupational Diseases Act and the Unemployment Insurance Act." (Emphasis added.) 745 ILCS 10/9--107(b) (West 2000).

The trial court, applying the foregoing provisions, focused on the following language found in both sections 9--103 and 9--107 of the Tort Immunity Act: "risk management directly attributable to loss prevention and loss reduction." The court found first that the term "risk management" does not have a common usage, as it does not appear in popular dictionaries. Next, the court found that the term is commonly used in the insurance industry and has meaning in that context. The tax objectors' expert, Saxton-Williams, defined it as a process involving several steps. The court found that the taxing districts' expert, Browne, proposed a "vague" definition that is inconsistent with the overall legislative purpose of an extraordinary and limited tax. To construe the term "to include all actions deliberately taken to reduce risk--meaning, therefore[,] that all actions deliberately taken to

reduce risk could be paid from the Tort Immunity Levy--would destroy the legislature's purpose." According to the trial court, the more limited definition proposed by the tax objectors more closely serves the legislature's intention. The trial court found that the term "risk management directly attributable to loss prevention and loss reduction" means more than deliberate actions intended to reduce risk or the performance of duties with care. It adopted the four-part definition of "risk management" proposed by the tax objectors: (1) the prior identification and analysis of loss exposures; (2) the selection of techniques to be used to handle each exposure; (3) the implementation of the chosen techniques; and (4) the periodic monitoring of the implementation of the techniques, including the making of adjustments as appropriate.

As to Pearl City School District, the trial court found that the district did undertake a risk management process, which resulted in the challenged salary expenditures, and that the process comported with the criteria for risk management under sections 9--102 and 9--107 of the Act. The court noted that the presence of written records justifying time spent was not a factor in its determination. It further noted that the tax objectors did not challenge the district's levy as to individual uses, but instead framed the issue as whether any use of the levy was lawful.

As to Freeport School District, the trial court found that the tax objectors established the absence of any formal risk management process that would permit the district to use its levy to defray portions of employee salaries. The court noted that the district had not performed pursuant to the Act any study or analysis of its risks, developed any techniques by which it expected to reduce or eliminate such risks, or established a process to periodically review the techniques' effectiveness. Addressing the fact that some district employees are required to assign risk management duties to other employees, the court found that none of these responsibilities are part of a risk management

process and are simply manifestations of the duty to perform their job duties with due care. The trial court also found that the district, in an attempt to justify its use of the tort levy, conducted a retrospective estimation of the time employees used to perform tasks that might reduce risk. It then designated those tasks as risk management.

Addressing Freeport Park District's levy, the trial court found that, like Freeport School District, the challenged expenses were "retrospective justifications for using the Tort Immunity levy to supplement other levies from which salaries are more appropriately paid." Acknowledging the district's safety policy manual, the court found that, "while it may be part of a process of risk management, [it] is not itself the process." It further found that, although the district's safety committee might have engaged in a form of risk management, the district did not base its use of the levy upon compliance with the committee's recommendations. Rather, the district, like Freeport School District, appears to have reviewed the job descriptions and work performed by certain employees to determine the time these employees spend maintaining a safe environment, and it then characterized those activities as risk management activities. The court found that the manual and the committee did not control the district's determinations as to whether the employees were performing tasks that could be paid for with funds raised under the Act.

The parties take issue with the trial court's interpretation of the Act. Specifically, the tax objectors argue that the term "risk management" is not defined in the Act. They assert that there is no plain and ordinary meaning of the term and thus it is ambiguous. Noting that the parties' experts defined "risk management" in different ways, the tax objectors also contend that it is ambiguous because the term is capable of being understood by reasonably well-informed people in two or more different ways. Accordingly, they next argue that every rule of statutory construction supports their

position that the term "risk management" relates to the analysis and recommendation of methods that can be used to reduce loss and that it does not involve the actual expense of implementing the risk management recommendation. According to the tax objectors, risk management is essentially what professional risk managers do and the implementation of risk management recommendations are operational expenses that cannot be funded under the Tort Immunity Act. Relying on the policy in section 9--107(a) of the Act, they assert that salaries should be paid from the education fund that provides for payment of employees' salaries. They further contend that Pearl City School District is doing what the legislature sought to prevent--using the tort fund to pay for ordinary expenses such as salaries. The tax objectors also argue that it is impermissible for the district to pay for educational and operational expenses that "might" result in a reduction in liability claims, whether or not they actually result in a reduction of liability claims. They contend that the district's use of tort funds in this way can potentially result in the use of the levy to fund virtually any activity that is safety related. The tax objectors posit that, under this reasoning, there is nothing to stop the use of tort funds to replace an old parking lot or to pay all of a school bus driver's salary because he or she is constantly providing safety for students.

Pearl City School District responds that the issue in this appeal is whether the Act authorizes taxing bodies to pay any portion of their employees' compensation that is directly related to their risk management functions. The district also takes issue with the tax objectors' contention that the Tort Immunity Act permits only the development of a risk management plan and not the implementation of such a plan. They suggest that the tax objectors' four-step process contradicts this assertion and that the statute contains no language limiting the scope of risk management to only the development of such a program. According to the district, the language "educational, inspectional and supervisory

services directly related to loss prevention and loss reduction" in section 9--107(b) necessarily encompasses the implementation of a risk management program, including employees' activities undertaken to reduce or prevent tort losses. According to the district, the tax objectors' proposed interpretation to limit tort expenditures to the management component of hiring an expert renders superfluous the statute's language providing for "educational, instructional and supervisory services directly relating to loss prevention and loss reduction" and "risk management directly attributable to loss prevention and loss reduction."

Pearl City School District further argues that the evidence demonstrated that it used the levy proceeds to fund parts of its employees' compensation for educational, inspectional, and supervisory services directly related to loss prevention and loss reduction and to support the district's risk management Plan. It asserts that the plain language of the Tort Immunity Act authorizes such expenditures. The district further contends that its Plan was developed pursuant to the Act; that it was directed at reducing and preventing tort losses as defined by the Act; that it required district employees to perform specific risk management services; and that it provided that employees may be compensated from the tort fund for those portions of their educational, inspectional, and supervisory services that are directly related to their risk management responsibilities. The district notes that its superintendent continuously monitors how employees perform risk management activities and recommends any adjustments.

In their appeal addressing the first certified question, Freeport School District and Freeport Park District argue that using their levies to pay portions of their employees' salaries is consistent with risk management principles embodied in the Act. They contend that they examined their employees' job duties to determine which employees were best suited to assist them in reducing or

preventing exposure to tort liability. The districts also assert that their experts' opinions should have been given more weight than Saxton-Williams's opinions. They argue that Saxton-Williams was unqualified to testify in this matter, that his testimony and reports were inconsistent, and that some of his testimony actually supports the districts' positions. The districts note that Saxton-Williams testified that every employee's job contains some risk management function if properly performed and that risk management takes place when employees are instructed through written job descriptions that part of their jobs is to help their districts avoid losses. According to the districts, this occurred in each of their cases. In the alternative, the districts argue that, even assuming that Saxton-Williams's interpretation of risk management is correct, their practices fall within those parameters. Freeport Park District asserts that it had a formal process that was designed to identify, address, and reduce or eliminate tort exposure. The districts also note that the Act does not contain language supporting the tax objectors' position that it is permissible under the Act to pay for advice but impermissible to implement that advice.

Freeport School District and Freeport Park District also contend that there are no significant differences between their risk management practices, which the trial court found lacking, and Pearl City School District's Plan, which the trial court approved. They argue that, although Pearl City School District's plan was in writing, the trial court found that a written plan was not required. The Freeport districts assert that, in all other respects, their risk management practices mirror Pearl City School District's Plan: in developing their risk management plans and objectives, they reviewed the time employees spent performing risk management duties; they paid portions of salaries with their tort levies; and they trained employees in safety and tort-prevention procedures. The Freeport districts reason that this court should reverse the trial court's findings as to their practices.

The primary rule of statutory construction is to ascertain and give effect to the legislature's intent. Paszkowski v. Metropolitan Water Reclamation District of Greater Chicago, 213 Ill. 2d 1, 6 (2004). Our analysis begins with the statutory language, which remains the best indication of that intent. Metzger v. DaRosa, 209 Ill. 2d 30, 34-35 (2004). The language must be afforded its plain, ordinary, popularly understood meaning. Moore v. Green, 219 Ill. 2d 470, 479 (2006). When the language is unambiguous, the statute must be applied as written, without resorting to other aids of construction. Moore, 219 Ill. 2d at 479. We may not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. Hood v. Illinois High School Ass'n, 359 Ill. App. 3d 1065, 1069 (2005). "Legislative intent can be ascertained from a consideration of the entire [statute], its nature, its object and the consequences that would result from construing it one way or the other." Fumarolo v. Chicago Board of Education, 142 Ill. 2d 54, 96 (1990). Legislative intent remains the paramount consideration: "Traditional rules of statutory construction are merely aids in determining legislative intent, and these rules must yield to such intent." Paszowski, 213 Ill. 2d at 7. In this regard, we may properly consider the statute's purpose, the problems it targets, and the goals it seeks to achieve. Moore, 219 Ill. 2d at 479-80.

The Tort Immunity Act's purpose is to "protect local public entities and public employees from liability arising from the operation of government." 745 ILCS 10/1--101.1 (West 2000). In promulgating the Tort Immunity Act, the legislature "sought to prevent the dissipation of public funds on damage awards in tort cases." Van Meter v. Darien Park District, 207 Ill. 2d 359, 368 (2003).

Section 9--103(a) of the Act permits a local public entity to protect itself against tort liability via "risk management directly attributable to loss prevention and loss reduction" and "educational, inspectional, and supervisory services directly relating to loss prevention and loss reduction." 745 ILCS 10/9--103(a) (West 2000). Section 9--107(b) of the Act sets forth the tax levy power at issue here. See In re Consolidated Objections to Tax Levies of School District No. 205, 193 Ill. 2d 490, 497 (2000) (People Who Care). It provides that a local public entity may levy a sum to pay the cost of, inter alia, "educational, inspectional, and supervisory services directly relating to loss prevention and loss reduction" and "to pay the cost of risk management programs." 745 ILCS 10/9--107(b) (West 2000). The parties rely to varying degrees on one or both of the foregoing.

We agree with the tax objectors that the meaning of the term "risk management" as used in section 9--107(b) is ambiguous. A plain reading of the relevant statutory provisions does not aid in answering the first certified question. The term is not defined in the Act or, as the trial court noted, in popular or legal dictionaries. As further support for our conclusion that the term is ambiguous, we note that two experts whose testimony was admitted by the trial court provided different definitions. "A statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more different ways." Krohe v. City of Bloomington, 204 Ill. 2d 392, 395-96 (2003).

The tax objectors turn next to the legislative history of the Tort Immunity Act to argue that the term "risk management" relates to analysis and recommendations relating to loss control and risk management and does not relate to the actions needed to implement the recommendations. Where the meaning of a statute is unclear or ambiguous from the statutory language itself, a court may consider aids of statutory construction, including legislative history, to determine legislative intent.

In re B.L.S., 202 Ill. 2d 510, 517 (2002). In doing so, a court should presume that the legislature did not intend absurdity, inconvenience, or injustice. B.L.S., 202 Ill. 2d at 517.

The tax objectors assert that the Senate debates clarify that tort funds cannot be used to implement safety-related recommendations or for operations or maintenance expenses, including custodians' and food service workers' salaries. Pearl City School District responds that the legislature left open to interpretation what specific risk management expenditures are appropriate, relying instead on the taxing bodies' judgment and leaving the matter to elected officials and not to the courts. Freeport School District and Freeport Park District also criticize the tax objectors' reliance on legislative history, arguing that, here, it is not insightful. They note that the history upon which the tax objectors rely does not consist of legislative debates, but of proceedings where legislators were presenting summaries of amendments; thus, it is unreliable.

As to the legislative history, we reject the tax objectors' argument that it clearly shows that the payment of salaries with the tort levy is impermissible. In our view, the history is ambiguous. During the 1999 House debates on an amendment that added the preamble to section 9--107 of the Act (i.e., section 9--107(a)) and language to section 9--103(a) requiring taxing bodies to include in their audits or annual reports expenditures made from the tort levy, the bill's sponsor, Senator Klemm, noted that the bill would preclude use of the tort levy to pay for custodians, food service workers, and districts' lawyers' salaries. However, upon being questioned whether a community college district could pay for its security officers with the tort monies, Senator Klemm responded that the question had been forwarded to the Attorney General for guidance. 91st Ill. Gen. Assem., Senate Proceedings, March 23, 1999, at 256. The tax objectors have not identified any subsequent guidance from the Attorney General. Therefore, the question remains unanswered. The bill's sponsor in the

House, Representative Winters, explained that the amendment was targeted at cases where districts had funded with their tort levies the painting of lot lines in parking lots, the purchase of football helmets, and the construction of running tracks. He further explained that the bill precluded building new facilities "on the chance that they might reduce injuries." 91st Gen. Assem., House Proceedings, May 26, 1999, at 53-54 (Statement of Rep. Winters). However, later in the proceedings, upon being asked if tort monies could be used for construction, Representative Winters responded that it was up to the courts to decide. 91st Gen. Assem., House Proceedings, May 26, 1999, at 57.

The legislature included a preamble within section 9--107 of the Act. Although a preamble is not itself a part of the act, "[a] preamble has long been recognized as one of the quintessential sources of legislative intent." Atkins v. Deere & Co., 177 Ill. 2d 222, 232 (1997). Further, it "constitutes a stronger expression of intent than does a passing comment made by a single legislator during legislative debates." Atkins, 177 Ill. 2d at 232-33. Section 9--107(a) instructs that section 9--107's provisions are to be strictly construed and that the purpose of the section is to provide an "extraordinary tax for funding expenses relating to tort liability, insurance, and risk management programs." 745 ILCS 10/9--107(a) (West 2000).

With that policy declaration in mind, we turn to the definitions of "risk management" offered by the parties' experts. Preliminarily, we note that an expert witness may not render an opinion as to a question of law, including statutory construction. Town of the City of Bloomington v. Bloomington Township, 233 Ill. App. 3d 724, 735 (1992). However, if the common meaning and the legal meaning are the same, the testimony is generally proper. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §704.1, at 587 (8th ed. 2004). Here, the legislature did not define the

term "risk management" and so we shall assume it intended the courts to apply the common meaning in the insurance industry while mindful of the legislature's policy declaration.

Saxton-Williams, the tax objectors' expert, testified that risk management is a process that consists of: identifying and analyzing loss exposures; selecting a technique or combination thereof to be used to handle each exposure; implementing the chosen techniques; and monitoring the decisions made and implementing appropriate changes. Browne offered a broader definition of "risk management," opining that any one of the elements listed by Saxton-Williams constitutes risk management. In rendering their opinions, both experts relied on textbooks used in the insurance industry that set forth commonly accepted principles of that industry. Saxton-Williams rejected the notion that risk management includes safety practices engaged in by district employees as part of their normal duties and arising out of "their own common sense." Saxton-Williams opined that merely locking a door at night, for example, is not risk management; rather, it is common sense. Risk management, he explained, is a conscious effort to prevent losses. A safety step can constitute risk management if it is a conscious act based upon an outline of a procedure. Risk management includes training and monitoring the effectiveness of the program. In contrast, Browne opined that school personnel, including teachers, cooks, janitors, bus drivers, and administrators, regularly engage in risk management activities. He explained that risk management is an essential component of these occupations. Browne also testified that an entity could have in place a risk management plan or program that did not include any provisions for monitoring its effectiveness.

As between the experts' opinions, we agree with the trial court that Saxton-Williams's definition is more in keeping with the legislature's policy declaration. As is evident from Browne's testimony, a great many of the employees in a school district, for example, engage regularly in risk

management activities. This broad reading of the term cannot be reconciled with the legislature's instruction that the levy is an "extraordinary tax" with a "limited purpose," or its mandate that we strictly construe section 9--107 of the Tort Immunity Act. Adoption of Browne's definition, for example, would necessarily require that any safety-related responsibility be construed as risk management. As "safety" itself is such a broad term, it would necessarily be a part of nearly every taxing district's employee's job description and, under the districts' reasoning, justify funding of a portion of nearly every employee's salary with monies levied pursuant to section 9--107. We do not believe the legislature intended such a reading of the statute.

Turning to the tax objectors' appeal as to Pearl City School District's levy, we conclude that the district's Plan constitutes a risk management program under section 9--107 of the Act, at least with respect to the superintendent's responsibilities outlined thereunder. In our view, as to the superintendent, the district's Plan meets the criteria outlined by Saxton-Williams. Addressing the superintendent's responsibilities, the Plan provides:

> "The Superintendent shall be responsible for the development of the program, identifying the various components of the program, and delegating responsibilities for these components to the appropriate personnel. It is expected that the Superintendent will continually evaluate the effectiveness of the program and be apprised of needed revisions, additions or deletions to the components and assigned responsibilities."

This excerpt reflects that Pearl City School District has incorporated into its Plan all of the components of a risk management program. As to the first element identified by Saxton-Williams, identification and analysis of loss exposures, the superintendent must identify the components of the program, whose purpose is to prevent or reduce the district's exposure to liability. As to the second

and third elements, technique selection and implementation, the superintendent delegates responsibility for the components of the program to appropriate personnel whose risk management responsibilities are outlined in the Plan. Finally, as to the periodic monitoring of the implemented techniques, the Plan provides that the superintendent will continually evaluate the effectiveness of the program and be apprised of needed revisions.

However, we reject Pearl City School District's argument that all of the employee positions that the Plan has assigned specific risk management responsibilities may be partially funded by the tort levy. Mere reference to such responsibilities and positions in the Plan does not automatically render the salary funding permissible under section 9--107. The responsibilities and positions must, in the context of the entire process, satisfy the criteria set forth by Saxton-Williams. The job descriptions in the district's Plan do not reflect that the various positions--bus drivers, food service workers, school nurses, principals, and teachers--are assigned any tasks that are above and beyond the ordinary safety tasks associated with the respective job titles. Most notably absent from the job descriptions are responsibilities to identify and implement techniques to reduce liability exposure and to monitor the effectiveness of the implemented techniques. In summary, no responsibilities above and beyond the ordinary job duties are assigned to the various personnel, with the exception of the superintendent.

We also reject Pearl City School District's argument that the salaries it paid with its levy constitute educational, inspectional, and supervisory services directly relating to loss prevention and loss reduction. Although the district's bus drivers, food service workers, nurses, principals, and teachers perform duties that are educational, inspectional, and/or supervisory, they do not do so within the meaning of section 9--107 of the Act. We believe that the phrase, "services directly

relating to loss prevention and loss reduction," strictly construed and justifying an "extraordinary tax," does not encompass ordinary duties performed by regular staff. As we noted above with respect to safety-related duties, such a reading of the statute is so broad as to justify funding of nearly every school district employee's position with tort monies. In light of the legislature's policy statement, we cannot conclude that the legislature intended such an interpretation.

Turning to the Freeport districts, we conclude that payment of portions of their employees' salaries with tort levy monies is not authorized by section 9--107(b) because the districts' practices do not constitute risk management programs. The districts' assertion that they have in place "risk management programs" because they engaged in thorough examinations of their employees' job duties to determine which were best suited to assist in risk management is unavailing.

Freeport Park District paid portions of the salaries of some of its supervisory and administrative employees, maintenance workers, recreational workers, and police and security employees by reviewing job descriptions and identifying positions that were best suited to help reduce or prevent tort liability exposure. However, absent from Freeport Park District's practices are the four elements of the risk management process outlined by Saxton-Williams. There was no evidence presented that Freeport Park District engaged in a process whereby it identified loss exposures, selected and implemented techniques to address each exposure, and monitored the effectiveness of its chosen techniques. Indeed, as the trial court noted, the alleged risk management responsibilities assigned to various district positions are merely responsibilities to perform respective job duties with due care. This alone does not constitute a risk management program as contemplated under the Act.

The district's safety policy manual does not constitute a risk management program as contemplated by the Act, as it, too, does not incorporate the aforementioned elements. As to the district's risk management policy, it consists of a one-page document setting forth a policy statement. Therein, the district states that its policy will identify sources of loss to the district, evaluate the impact of any losses, make efforts to control any losses through specific written action plans, eliminate losses through corrective actions or risk transfers, and, where possible, obtain overage in amounts and in such areas as will provide protection against catastrophic loss. Although this aspirational statement incorporates the elements set forth by Saxton-Williams, there was no evidence presented by Freeport Park District that its alleged risk management program was actually implemented. Accordingly, we conclude that the district's use of its tort levy to partially fund employee salaries was not authorized by the Tort Immunity Act.

Freeport School District's arguments fail for similar reasons. The district asserts that it reviewed employee responsibilities to determine which duties involved risk management and then paid those portions of the employees' salaries with its tort fund levy. However, no formal process existed by which the district identified loss exposures, selected and implemented techniques to address potential liability, and monitored the effectiveness of its chosen techniques.

We reject the Freeport districts' argument that their experts' opinions should have been given more weight than Saxton-Williams's opinions. As we discussed above, the definition of risk management that Saxton-Williams offered follows the policy and instructions the legislature set forth in section 9--107(a), that the levy is an extraordinary tax and that courts strictly construe the statute. We also reject their contention that Saxton-Williams's testimony that every employee's job includes risk management responsibilities amounts to a concession that all risk management duties may be

compensated through a tort levy. The districts mischaracterize Saxton-Williams's testimony. His testimony clearly reflected that safety-related duties, on their own, do not constitute a risk management program.

In summary, we agree with the trial court that at least some of Pearl City School District's salary expenditures were permissible under the Act and that Freeport School District's and Freeport Park District's expenditures were not authorized by the Act. Therefore, we answer the first certified question as to Pearl City School District in the affirmative and as to Freeport Park District and Freeport School District in the negative.

B. Second Certified Question: Whether Use of Revenue Generated by Highland Community College District's Tort Immunity Levy to Pay for Safety- and Security-Related Expenditures is Authorized by the Tort Immunity Act

Turning to the second certified question--whether Highland Community College District's use of tort money to pay for OSHA training, campus safety software, and ergonomics training is authorized by the Act-- the trial court found that the district did not engage in the risk management process required by the Act, because there was no process by which it first identified specific exposures under the statute and then selected techniques to reduce or eliminate those exposures, with periodic review and adjustment of the techniques. Addressing the district's payment of certain salaries, the court found that, instead, the district used levy monies to fund routine job duties identified as having a relation to college safety. However, turning to the safety-related expenses, the court found that OSHA training, campus security software, and ergonomics training were permissible under the Act. The court rejected certain other safety-related expenses that are not at

issue in this appeal, including expenditures for road salt, fire extinguishers, elevators, snow plows, first aid equipment, radios, and door openers, finding that they were "routine expenses" and not part of a risk management process.

The tax objectors restate the arguments they raised above concerning Pearl City School District's expenditures. They assert that Highland Community College District's safety-related expenditures were for items that are normal operating expenses. According to the tax objectors, the district did not present any evidence that its expenditures were part of any risk management program or were directly attributable to loss prevention and loss reduction. The tax objectors also argue that there was no evidence presented regarding what training employees received or how it was related to loss prevention and that there was no evidence presented that any employee on any specific date took any safety-related course pursuant to a risk management program designed to prevent loss reduction.

The district responds that the Tort Immunity Act's purpose and the breadth of discretion it grants to taxing bodies belie the tax objectors' and the trial court's narrow interpretation of and focus on the term "risk management." It contends that its safety and security-related expenditures are an integral part of its risk management program and qualify as "educational, inspectional and supervisory services." See 745 ILCS 10/9--107(b) (West 2000). The district also argues that it has instituted a deliberate program under which it performs a multi-tiered review of proposed expenditures to determine the appropriateness of allocating them to the tort fund. Once the appropriate expenditures are selected, management employees who are responsible for the program review the selections.

We conclude that Highland Community College District's OSHA training and ergonomics training expenses are authorized by section 9--107 of the Act. Although the evidence showed that the district did not have a risk management program, we believe that the expenditures constitute "educational, inspectional, or supervisory services directly relating to loss prevention and loss reduction." Where statutory language is unambiguous, it must be applied as written, without resorting to other aids of construction. Moore, 219 Ill. 2d at 479. OSHA training and ergonomics training certainly constitute educational services directly relating to loss prevention and loss reduction, as those terms are commonly understood. Accordingly, we agree with the trial court as to these items. Campus security software, on the other hand, constitutes a good and not a service, as those terms are commonly understood and under commercial law (see Dealer Management Systems, Inc. v. Design Automotive Group, Inc., 355 Ill. App. 3d 416, 421-22 (2005)), and we agree with the tax objectors that this expenditure is not authorized under the Act because it is not an educational, inspectional, or supervisory service directly relating to loss prevention and loss reduction. Accordingly, we disagree with the trial court's determination as to this item.

In summary, we answer the second certified question in the affirmative as to OSHA and ergonomics training and answer it in the negative as to campus security software.

C. Third Certified Question: Whether Use of Tort Immunity Levy Proceeds by Freeport School

District to Partially Fund its Equity Program is Authorized by the Tort Immunity Act

Freeport School District appeals from the court's finding that it illegally used tort funds to partially pay for its equity program. The district contends that the expenditure is authorized by both section 9--102 of the Act and case law.

Section 9--102 of the Tort Immunity Act, which is entitled "Payment of judgments or settlements--compromise and settlement of claims," provides:

"A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages for which it or an employee while acting within the scope of his employment is liable in the manner provided in this Article. All other provisions of this Article, including but not limited to the payment of judgments and settlements in installments, the issuance of bonds, the maintenance of rates and charges, and the levy of taxes shall be equally applicable to judgments or settlements relating to both a local public entity or an employee and those undertakings assumed by a local public entity in intergovernmental joint self-insurance contracts. A local public entity may make payments to settle or compromise a claim or action which has been or might be filed or instituted against it when the governing body or person vested by law or ordinance with authority to make over-all policy decisions for such entity considers it advisable to enter into such a settlement or compromise." (Emphasis added.) 745 ILCS 10/9--102 (West 2000).

The trial court found that the district's use of tort levy proceeds to partially fund its equity program was not authorized by the Act. The court noted that the primary use of the money funding the program was for payment of salaries and benefits and that it is entirely remedial and has no ending date. The trial court found that the agreement did not finally settle FAAMUC's claims because FAAMUC agreed to withhold litigation only pending the "outcome" of the equity program. Noting that the issue might have been in reasonable dispute at the time the district instituted its program, the court found that People Who Care, which was decided after the program was instituted, was directly on point in deciding the issue. Relying on that case, the court found that the payment

of only compensatory damages may be funded under section 9--102 of the Act and that the district had not paid such damages:

> "No certain sum of money is paid to the plaintiffs. The money being levied has no definite end. There is no cap. The taxpayers cannot know when the claim put forward by [FAAMUC] will be fully satisfied. The school district is, in short, funding its own agreed form of injunctive relief through the use of a taxing statute which excludes such use."

In People Who Care, the tax objectors challenged real estate taxes levied by the board of education of Rockford School District No. 205 to fund equitable (i.e., injunctive) remedies ordered in separate federal school desegregation litigation. The supreme court addressed whether section 9--102 authorized the school district to levy taxes under section 9--107. Specifically, the court examined whether the injunctive remedies constituted "compensatory damages" within the meaning of section 9--102. Relying on the term's plain and ordinary meaning and applying strict construction due to its placement in a taxing statute (i.e., section 9--107), the court held that the term "compensatory damages" in section 9--102 refers to monetary damages in tort judgments or settlements. People Who Care, 193 Ill. 2d at 497-98. It further held that section 9--102 does not apply to the payment of costs of complying with injunctive relief. People Who Care, 193 Ill. 2d at 498. According to the court, the Act does not authorize the levying of taxes to fund desegregation remedies and, because the injunctive relief ordered did not constitute compensatory damages under section 9--102, it could not be funded under section 9--107. People Who Care, 193 Ill. 2d at 506-07.

Freeport School District argues that FAAMUC's threatened lawsuit included a claim for compensatory damages and, therefore, the settlement falls within the supreme court's People Who Care holding. It further asserts that its creation of the equity program and its avoidance of major

civil rights litigation and the damages and attorney fees that would have resulted were the types of cost reduction steps the Tort Immunity Act was designed to foster. Taking exception to the trial court's interpretation of the Act, the district argues that the Act does not require that the settlement amount be a sum certain so that taxpayers will know when the claim is satisfied. Rather, the Act allows a taxing body to "pay any tort judgment or settlement for compensatory damages." 745 ILCS 10/9--102 (West 2000). According to the district, the broad grant of authority to use its discretion in settling claims is not saddled with the limitations read into that authority by the trial court. It further asserts that the question whether it may use its tort fund levy to partially fund its program has not been decided in Illinois and that the trial court's reliance on People Who Care is misplaced. It asserts that the threatened litigation that resulted in the creation of the equity program could have resulted in compensatory damages as well as attorney fees, not equitable relief (including injunctive relief) as in People Who Care.

We find the district's argument unconvincing. Section 9--102 of the Act refers to a "tort judgment or settlement for compensatory damages." The district here did not pay to FAAMUC under the MOU any compensatory damages. It agreed only to institute educational initiatives to assist it in attaining certain achievement outcomes for minority students. Its actions under the equity program and pursuant to the MOU were, therefore, remedial. The supreme court held in People Who Care that section 9--102 of the Act does not apply to the payment of costs of complying with injunctive (i.e., remedial) relief.

We reject the district's argument that the fact that FAAMUC's threatened lawsuit included a claim for compensatory damages requires a different result. The supreme court held that the term "compensatory damages" in section 9--102 refers to monetary damages in tort judgments or

settlements. We find irrelevant the fact that the plaintiff in <u>People Who Care</u> sought equitable and declaratory relief and the FAAMUC here threatened to bring a lawsuit that could have resulted in compensatory damages. The supreme court in <u>People Who Care</u> focused solely on the use of levy taxes to fund the cost of complying with the remedies to which the district in that case agreed or was ordered to implement by the federal court. The remedies the district agreed to here do not constitute compensatory damages.

In summary, we conclude that Freeport School District's use of tort immunity levy proceeds to partially fund its equity program is not authorized by the Tort Immunity Act. Therefore, we answer the third certified question in the negative.

V. CONCLUSION

For the foregoing reasons, we answer the first certified question as to Pearl City School District in the affirmative and as to Freeport Park District and Freeport School District in the negative. We answer the second certified question in the affirmative as to OSHA and ergonomics training and answer it in the negative as to campus security software. Finally, we answer the third certified question in the negative.

Certified questions answered; cause remanded.

BOWMAN and BYRNE, JJ., concur.